IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

GRANT KIDD, JR.,

Defendant.

CRIMINAL CASE NO.

1:16-CR-00172-AT-JFK

## REPORT AND RECOMMENDATION

Pending before the court is Defendant Grant Kidd, Jr.'s motion [Doc. 15] as perfected [Doc. 26] to suppress a statement that he gave on January 14, 2016, to Special Agents of the Federal Bureau of Investigation ("FBI"). An evidentiary hearing was held on the motions on September 7, 2016.[1] [Doc. 30]. In his post-hearing brief in support of his motions to suppress, Defendant contends that, based on the totality of the circumstances, he was in custody when he gave the statement and that, therefore, he should have been but was not advised of his Miranda rights at the initiation of the interview. Defendant further contends that his statement was involuntary. [Doc. 33].[2]

---

[1]Citations to the transcript of the hearing are:  (Tr. at ).

[2]In his motions to suppress, Defendant contends that the FBI agents misled him regarding his obligations under Garrity v. New Jersey, 87 S. Ct. 616 (1967), during the interview.  However, the undisputed evidence presented at the hearing held on the motions to suppress demonstrate that Garrity was not even mentioned during the

The Government opposes the motion to suppress the statement asserting that Defendant was not in custody during the time he was being interviewed and that his statement was voluntary.   [Doc. 34].   After consideration of the totality of the circumstances, the court recommends that Defendant's motions be denied.

## I.     Facts

In early 2016, Special Agent Andrew Benjamin, a member of the FBI's Public Corruption Squad, was conducting an investigation of a Clayton County Police Officer, Defendant Grant Kidd, Jr., for allegedly soliciting a bribe from Michael and Michelle Pierce, who were charged with theft by taking, involving a stolen vehicle. Defendant, according to a taped conversation with the Pierces, discussed having the

---

interview. (Tr. 6, 11, 46-47).  Defendant's post-hearing brief in support of his motion to suppress does not address Garrity.  [Doc. 33].  Accordingly, the court finds that Defendant has abandoned any Garrity-based arguments.  See United States v. Zekic, 2010 WL 4962985, at *1 (N.D. Ga. October 28, 2010) (citing Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.")), adopted by 2010 WL 4967825 (N.D. Ga. December 1, 2010); accord United States v. Elder, 2010 WL 5656687, at *3 (N.D. Ga. December 16, 2010) (citing United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1327 n.3 (N.D. Ga. 2009) ("Defendant has not perfected the motion [to suppress], and it is deemed abandoned and withdrawn. United States v. Shorr, No. 1:07-cr-182, 2008 WL 655994, [at] *1 (N.D. Ga. Mar[ch] 10, 2008) (Thrash, J., adopting Vineyard, M.J.) (deeming preliminary motion to suppress abandoned because the defendant failed to perfect the motion).") (internal quotation marks omitted)), adopted by 2011 WL 294507 (N.D. Ga. January 27, 2011).

2

charges dismissed by the Clayton County District Attorney in return for a sum of money. (Tr. at 4, 12, 18-19; Government Exhibit ("Gov't Exh.") 1).[3] On January 14, 2016, the agent contacted Defendant to make arrangements to conduct an interview with him. (Tr. at 5-6, 20-21). The agent, who was accompanied by Special Agent Kathleen McGowan, also a member of the Public Corruption Squad, left a voice message for Defendant as they traveled from the FBI office to Clayton County advising that he would like to speak to Defendant "about a case that he[, Defendant,] was involved in" that concerned "a stolen car[.]" (Tr. at 6, 29-30, 33). The agent did not state in the message that Defendant was the subject of an investigation. (Tr. at 6, 23). The agents recalled that Defendant returned the call, and, although the agents suggested meeting in the lobby of a hotel, Defendant suggested that they meet at a Clayton County Police Department ("CCPD") precinct. The agents agreed to meet Defendant at that location.[4] (Tr. at 6, 27-28, 33-34, 38-40). Agent Benjamin did not

---

[3]Agent Benjamin recorded the interview with Defendant Kidd. (Tr. at 12; Gov't Exh. 1).

[4]On cross-examination, Defendant's attorney questioned whether Defendant returned the call or if he was summoned to the police precinct by a dispatcher after the agents arrived and advised that they were there to speak with Defendant. (Tr. at 20-22, 27). Agent Benjamin testified that he made recordings of his attempts to contact Defendant but never claimed that he recorded Defendant's return call during which the arrangements to meet were discussed. (Tr. at 21-22; Defendant's Exhibit ("Def's

suggest to Defendant that he had to meet with them, and he obtained no assistance from Defendant's supervisors to set up the meeting.  (Tr. at 6).

The agents arrived at the precinct first and advised that they were there to speak with Defendant.[5]  (Tr. at 7, 26-27, 34, 41).  Shortly after arriving at the precinct, but before Defendant arrived, Agent Benjamin began the audio recording; Defendant was not advised that the interview would be recorded.  (Tr. at 10, 12, 26-27, 30, 34-35). A police lieutenant spoke to the agents; he was only told that they were there to speak to Defendant but not about the topic to be discussed; and he offered the use of an office for the interview.  (Tr. at 7, 25, 41-42).  When Defendant arrived, he and the agents entered the office and sat around a desk, with the door closed.  (Tr. at 8-9).

The agents identified themselves with their credentials and explained that they would like to ask Defendant a few questions and that they were not conducting an

---

Exh.") 1).   Agent Benjamin testified that he "really believed" that he spoke to Defendant but that he was not positive. (Tr. at 27).  Agent McGowan also recalled that Agent Benjamin spoke to Defendant over the phone to arrange the meeting at the precinct, and she did not recall dispatch contacting Defendant to come to the precinct. She stated that he already knew to meet them.  (Tr. at 33-34, 39-40-41, 46-47).

[5]The agents were attired in business casual clothing.  Agent Benjamin's firearm was either holstered on his hip or ankle, under his clothing, and Agent McGowan's firearm was inside her purse.  (Tr. at 9, 35).  Neither agent made reference to or brandished their firearms during the interview with Defendant.  (Tr. at 10, 35).

4

administrative investigation but a criminal investigation.  (Tr. at 9, 14, 28-29, 45; Gov't Exh. 1).  Agent Benjamin explained to Defendant that he would begin the interview by discussing a stolen vehicle.  When Defendant asked if he worked on the case, the agent responded that Defendant did not but that he knew people who were involved.  (Tr. at 13, 23, 42; Gov't Exh. 1).  After obtaining some background information from Defendant, Agent Benjamin then inquired as to Defendant's duties, and Defendant explained that he was a patrol officer and did not work property crimes.  The extent of his involvement in stolen property crimes, such as, stolen vehicles, would be to make the initial report and transport the vehicle to the impound lot.  Defendant did not work with Detectives, such as Randy Bashiers, who actually investigated property crimes, including the stolen vehicle purchased by the Pierces.  (Gov't Exh. 1).

Agent Benjamin then said that he would get to the heart of the matter regarding vehicles that were purchased from public storage houses.  When asked, Defendant denied knowing Michael Pierce and advised that he had seen Michelle Pierce.  Defendant also indicated that he heard from a third party[6] about the Pierces' buying a

---

[6]Defendant identified the third party as Travis, but the agent believed his name to be Trellis.  (Gov't Exh. 1).

5

2014 Toyota from public storage that turned out to be stolen and that the Pierces were charged with theft by taking.  Defendant advised the agents that, after hearing about the purchase of the Toyota, he told the third party that he did not believe the charges were good if the Pierces did not know that the vehicle was stolen when they bought it. (Tr. 13; Gov't Exh. 1).  Defendant denied any contact with the Pierces.  (Gov't Exh. 1).

At this point, Agent Benjamin advised Defendant that he, the agent, did not believe that Defendant was telling the truth.  He asked Defendant how he would be able to assist the Pierces in getting the charges dropped.  Defendant denied being able to do so.  (Gov't Exh. 1).  Agent Benjamin advised Defendant that, if he lied to the agents, he could be charged with making a false statement and then outlined for Defendant the information the agents had gathered about Defendant's meeting with the Pierces.  At that meeting, Defendant advised the Pierces that through a contact in the District Attorney's ("D.A.'s") Office he could get the charges dropped for the payment of an amount of money.  The agent stated to Defendant that this conduct would constitute soliciting a bribe. (Tr. at 14-15; Gov't Exh. 1).  Defendant denied being able to have the charges dropped or having any contact in the D.A.'s Office or in quoting a price for his assistance; again, he stated that he was only voicing his opinion that the

6

charges were not good.  (Gov't Exh. 1).  Agent Benjamin then advised Defendant that his meeting with the Pierces had been surveilled and recorded, and, when Defendant continued to deny asking for money or having a D.A.'s Office contact, the agent played part of the recording of the meeting with the Pierces.  Defendant continued to provide an explanation for his actions and words, that is, in part, that he would only make contact with unspecified individuals in the D.A.'s Office about the charges which could only be dismissed if not legally valid, but he denied wrongdoing.  (Gov't Exh. 1).

Agent Benjamin advised Defendant that the topic of their meeting would not be discussed with anyone else.  He explained that he was in the public corruption unit and that Defendant will be facing charges but would not be arrested today.  The agent also advised Defendant that he would be hearing from the United States Attorney's Office and would have an opportunity to cooperate if he chose.  The agent then thanked Defendant for speaking to them.  (Tr. at 15-16, 36; Gov't Exh. 1).  The interview lasted approximately thirty-three minutes.  (Tr. at 44; Gov't Exh. 1).  Defendant was not arrested until after the indictment was returned in May 2016.  (Tr. at 15-16).

Defendant was not initially advised that he was the subject of an investigation for soliciting a bribe; he was not told he had the right to remain silent or to have a

lawyer with him; and he was not told that he could terminate the interview at any time. (Tr. at 23-24, 28-29, 42-45).  Defendant did not ask to leave or stop the interview or refuse to answer questions, and he did not ask for a lawyer.  (Tr. at 14).  The agents did not advise Defendant initially that the meeting with him was anything more than the agents seeking information about a case involving Defendant within his usual duties as a police officer.[7]  (Tr. at 17, 23, 29-30, 44-46).  And the agents did not threaten Defendant or make him any promises.  There was no discussion about Defendant's employment, and no one in the police department was aware why the agents were meeting with Defendant.  There was no mention of <u>Garrity</u> to Defendant.  (Tr. at 10-11, 15, 35-36, 46-47; Gov't Exh. 1).

Additional facts will be set forth as necessary during discussion of Defendant's motion to suppress statements.

---

[7]On cross-examination, Defendant's attorney asked Agents Benjamin and McGowan a number of questions concerning what would have been reasonable to believe about the nature of the interview and how Defendant's participation in the interview might have been perceived as part of a law enforcement officer's job to meet with others in law enforcement.  (Tr. at 17, 23, 29-30, 44-46).  However, the record is devoid of any evidence regarding Defendant's belief, understanding or thoughts concerning his participation in the interview.  (Tr.; Gov't Exh. 1).

8

## II.    Discussion

### a.    <u>Miranda</u> Rights

Defendant contends that the totality of the circumstances establish that he was in custody on January 14, 2016, when he gave the statement to FBI agents and, therefore, that the failure to advise him of his <u>Miranda</u> rights prior to the interview violated his Fifth Amendment right against self-incrimination.  [Doc. 33 at 7-11].  In support of his argument, Defendant contends that he "had a duty to speak with" the agents, that it was part of his "responsibilities to cooperate and share information with other law enforcement agencies" and that "he had been compelled through his job responsibilities to meet with" the agents.  [<u>Id.</u> at 9-10].  He also argues that not being advised (1) of the true nature of the interview, (2) that he did not have to meet with the agents or (3) of his rights to remain silent and to have a lawyer present contributed to making the interview custodial.  [<u>Id.</u> at 10].  The Government contends that Defendant was not in custody when he gave his statements.  [Doc. 36 at 5-11].

In <u>Miranda v. Arizona</u>, 86 S. Ct. 1602 (1966), the Supreme Court held that "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be

used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" <u>Stansbury v. California</u>, 114 S. Ct. 1526, 1528 (1994) (quoting <u>Miranda</u>, 86 S. Ct. at 1612).  The Supreme Court subsequently clarified "that the freedom-of-movement test identifies only a necessary and not a sufficient condition for <u>Miranda</u> custody." <u>Maryland v. Shatzer</u>, 130 S. Ct. 1213, 1224 (2010).  The Court stated, "We have declined to accord it 'talismanic power,' because <u>Miranda</u> is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'"[8] <u>Id.</u> (quoting <u>Berkemer v. McCarty</u>, 104 S. Ct. 3138, 3148-49 (1984)).  Accordingly, "[a]n officer's obligation to administer <u>Miranda</u> warnings

---

[8]Applying this test to an investigative detention, the Eleventh Circuit Court of Appeals explained:

> [A]lthough a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment – and thus may be deemed to have been "seized" by law enforcement – he will not necessarily be considered in "custody" for Fifth Amendment purposes. . . .

> Rather, "a free-to-leave inquiry reveals *only* whether the person questioned was seized.". . .  While "seizure is a necessary prerequisite to <u>Miranda</u>, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*."

<u>United States v. Luna-Encinas</u>, 603 F.3d 876, 881 (11th Cir. 2010) (citations omitted; emphasis in original).

AO 72A
(Rev.8/82)

attaches . . . only where there has been such a restriction on a person's freedom as to render him in custody." Stansbury, 114 S. Ct. at 1528 (quoting Oregon v. Mathiason, 97 S. Ct. 711, 714 (1977) (per curiam)) (internal quotation marks omitted); accord United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006).

This determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 114 S. Ct. at 1529; and see United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (same). While "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned[,]" Stansbury, 114 S. Ct. at 1529-30, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was in custody at a particular time . . .," United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010) (citation and internal quotation marks omitted). "'[U]nder the objective standard, the reasonable person from whose perspective custody is defined is a reasonable innocent person.'" Street, 472 F.3d at 1309 (citation omitted); see also Brown, 441 F.3d at 1347 (same); United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) ("Whether a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant.").

11

The objective factors to be considered "include the location of the questioning, . . . its duration, . . . statements made during the interview, . . . the presence or absence of physical restraints during the questioning, . . . and the release of the interviewee at the end of the questioning . . . ." Howes v. Fields, 132 S. Ct. 1181, 1189 (2012); and see United States v. Riquene, 552 Fed. Appx. 940, 942 (11th Cir. 2014) (factors considered include "'whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled, as well as the location and length of the detention'") (quoting Luna-Encinas, 603 F.3d at 881 & n.1).  Defendant bears the burden of establishing that he was in custody and subjected to interrogation.  See United States v. Peck, 17 F. Supp. 3d 1345, 1353-55 (N.D. Ga. 2014) (citing United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977), and discussing and rejecting the defendant's arguments that de la Fuente no longer remains good law)).

As noted, Defendant relies on the compulsion he allegedly faced as a law enforcement officer to meet with the FBI agents and to be cooperative as a basis for finding that the interview was custodial.  [Doc. 33 at 9-10].  The significant hurdle for Defendant to overcome in making these arguments is that the record is devoid of any objective evidence that Defendant "had a duty to speak" or that it was his

AO 72A
(Rev.8/82)

"responsibility to cooperate and share information" with the FBI agents.  At best, the evidence supports an inference that, as a professional courtesy, one law enforcement officer will provide informational assistance to another officer.  (Tr. at 17, 30, 45-46).  And, although not relevant, see Stansbury, 114 S. Ct. at 1529, the record is also silent as to what, if any, subjective beliefs, understanding, or thoughts that Defendant harbored about being "compelled through his job responsibilities" to meet with the agents.  Frankly, Defendant's arguments on these points are based on conjecture which nonetheless do not support a finding that Defendant was in custody.  In fact, the evidence establishes that no one with whom Defendant worked had any idea why the agents met with Defendant and that Agent Benjamin did not secure Defendant's presence at the interview by suggesting that Defendant was compelled to do so or by contacting Defendant's superiors.  (Tr. at 6-7, 25, 41-42, 46-47).

Even if Defendant's position as a police officer initially contributed to his agreement to being interviewed or even if some concerns about his employment played a part in Defendant agreeing to the interview, Defendant still would not have established that the interview was custodial.  In United States v. Muegge, 225 F.3d 1267 (11th Cir. 2000), the Eleventh Circuit Court of Appeals found that the defendant's supervisor instructed him to report for the interview with investigators; however, the

court concluded that "such an order, absent other coercive elements, did not constitute the type of restraint on [the defendant's] freedom associated with a formal arrest." Id. at 1270.  In Muegge, the order to attend the interview "was [not] accompanied by any explicit or implicit threat to [the defendant's] employment status."  Id. at 1271. Likewise, in this case, there is no evidence of any order by Defendant's superiors to attend the interview much less any explicit or implicit threat to Defendant's employment.

Similarly, in United States v. Dudley, 2011 WL 1100607 (N.D. Ga. February 3, 2011), noting that the defendant cited "nothing coercive about the circumstances" of the interview "except for the fact that he feared he would lose his job if he did not cooperate with the . . . investigators[,]" because he had been ordered to speak with the investigators by his supervisors, the court found that this fact was "insufficient to create a custodial interrogation requiring that Miranda warnings be given."[9] Id., at *5.

_____

[9]The Dudley court cites, inter alia, a decision by the Eighth Circuit Court of Appeals, United States v. Dockery, 736 F.2d 1232 (8th Cir. 1984) (en banc), which held "that defendant was not in custody under similar circumstances where she 'was directed by her employer to meet with the agents' and noting that '[o]rdinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials [sic], but by the workers' voluntary obligations to their employers.'" 2011 WL 1100607, at *5 (quoting Dockery, 736 F.2d at 1234) (emphasis added).  Defendant relies on another decision of the Eighth Circuit in support of his argument; however, that decision, United States v. Ollie, 442 F.3d

14

And see United States v. Laurita, 821 F.3d 1020, 1027-28 (8th Cir. 2016) (overturning the lower court's finding that the defendant was in custody, in part, due to the fact that his supervisor told the defendant to come with him and escorted him to the meeting with the FBI agents, the appellate court noted that once the defendant and his supervisor arrived for the meeting, the supervisor left, did not pressure the defendant into speaking with the agents or comment about the interview and had no knowledge of the nature of the investigation); United States v. Seals, 2012 WL 4711970, at *4 & n.22 (N.D. Ga. July 9, 2012) (finding, based on the totality of the circumstances, that the defendant's contention that he was ordered to speak with the agents by his supervisor and was afraid he would lose his job if he refused did not establish that the

---

1135 (8th Cir. 2006), is distinguishable from the facts in Dockery and from the facts before this court.  In this case, there is no evidence that Defendant Kidd's employer directed him to go to the interview.  Whereas in Ollie, the defendant, who was on parole, was ordered by his parol officer at the request of law enforcement to meet with and talk to the police.  442 F.3d at 1136.  The court found significant that the defendant's "parole officer testified that it would have been a violation of his parole for [the defendant] to refuse to go to the meeting and that a refusal could have led to [the defendant's] parole being revoked . . . .  [The Defendant] had little choice but to comply."  Id. at 1138, 1140 ("Above all else, we think that it is the parole officer's order that [the defendant] meet with [the police] that quite clearly tips the balance" to finding the defendant was in custody.).  Under the facts before the undersigned, Defendant Kidd simply did not reasonably fear loss of his job much less of his freedom by declining the agents' request for an interview.

AO 72A
(Rev.8/82)

defendant was in custody), adopted by 2012 WL 4737398 (N.D. Ga. October 3, 2012).[10]

Furthermore, the other circumstances of the interview do not support a finding that Defendant was in custody.  The location of the interview, selected by Defendant, was his workplace, a CCPD precinct.  (Tr. at 27, 33-34, 39-40).  Although the interview occurred at the police precinct, which in many instances may factor in favor of finding custody,[11] the location in this instance "was 'in the familiar . . .

---

[10]And the other cases cited by Defendant, United States v. Rogers, 659 F.3d 74 (1st Cir. 2011), and United States v. Jacobs, 431 F.3d 99 (3rd Cir. 2005), are inapposite to the facts before this court.  In Rogers, the defendant, a non-commissioned Naval officer, received an order from his Naval base commander to return to his home where law enforcement officers were conducting a search for child pornography, were speaking with his pregnant wife and subsequently conducted the interview with the defendant.  The court found that "any member of the armed services" would reasonably feel compelled to submit to the interview.  Id. at 78-79.  And in Jacobs, the defendant, who reasonably believed that she was a FBI informant (unbeknownst to her, that status had been terminated) was summoned without explanation to a meeting at the FBI offices where she was subjected to a "confrontational and intimidating" interrogation.  431 F.3d at 107.  The evidence before the court apparently included the defendant's belief that she had to comply with the summons.  Id.  The totality of the circumstances resulted in a finding by the court that the defendant was subjected to a custodial interrogation.  Id. at 108.

[11]In California v. Beheler, 103 S. Ct. 3517 (1983), the Supreme Court stated, "[W]e have explicitly recognized that Miranda warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'"  Id. at 3520 (quoting Mathiason, 97 S. Ct. at 714 ("a noncustodial situation is not converted to one in which Miranda applies simply

16

surroundings' of [Defendant's] workplace[.]" <u>United States v. Maldonado</u>, 562 Fed. Appx. 859, 861 (11th Cir. 2014) (citation omitted); <u>and see</u> <u>Laurita</u>, 821 F.3d at 1027 (noting that interview occurred at the defendant's workplace "'a location familiar to [Laurita] and a place where [he] would be comfortable and less threatened'") (citation omitted); <u>Seals</u>, 2012 WL 4711970, at *4 (same); <u>United States v. Torres</u>, 2010 WL 736838, at *6 (D. Ariz. March 1, 2010) (same).

Likewise, the duration of the interview, approximately 33 minutes (Tr. at 44; Gov't Exh. 1), does not support a finding of custody. <u>See</u> <u>Seals</u>, 2012 WL 4711970, at *4 (finding that interview lasting two hours did not require that Defendant be advised of his <u>Miranda</u> rights) (citing, *inter alia*, <u>Muegge</u>, 225 F.3d at 1269-71 ("finding no custody where defendant was directed by his supervisor to speak with investigators in a secure location where he was interviewed for about two and one half hours . . .")). None of the statements made by the agents during the interview would have led Defendant, who was not physically restrained, to believe that he was in custody. The agents did not threaten Defendant and did not refer to or brandish

_____

because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment'" such as a police station or because the person is one suspected of committing a crime)).

17

firearms. (Tr. at 9-11, 15, 35-36, 46-47). Defendant, who the court finds voluntarily appeared for the interview, was not told that he was not free to leave but nonetheless could have left at anytime and was advised that he would not be arrested that day and would be contacted in the future about possible charges. (Tr. at 14-16, 28-30; Gov't Exh. 1). See Maldonado, 562 Fed. Appx. at 861-62 (noting that the defendant was not physically restrained and was free to leave at any time and that the agents never brandished their weapons). Although Agent Benjamin suspected Defendant of criminal activity and advised Defendant that he, the agent, did not believe Defendant and believed that Defendant had solicited a bribe, those suspicions and statements do not render the interview custodial. See Stansbury, 114 S. Ct. at 1530 ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."); United States v. Manor, 936 F.2d 1238, 1241 (11th Cir. 1991) ("The Supreme Court has clearly stated that Miranda is not implicated simply because an individual is the subject or target of an investigation.") (citing Minnesota v. Murphy, 104 S. Ct. 1136, 1144 (1984)). Finally, at the end of the interview, Defendant was not arrested and, in fact, was not arrested until several months later. See Maldonado, 562 Fed. Appx. at 862 (noting that the defendant left

18

at the end of the interview and was not arrested); <u>Seals</u>, 2012 WL 4711970, at *5 (noting that the defendant was not arrested at the end of the interview which "is a [v]ery important factor weighing against custody") (citation and internal quotation marks omitted).

In this case, the circumstances surrounding Defendant's interview with the FBI agents simply did not subject Defendant, either physically or psychologically, to "such a restriction on [his] freedom as to render him in custody." <u>Stansbury</u>, 114 S. Ct. at 1528 (citation and internal quotation marks omitted).  For the reasons cited, the court finds that Defendant was not custody and that, therefore, he was not entitled to <u>Miranda</u> warnings prior to the interview.

### b.    Voluntariness

Defendant also contends that his statement should be suppressed because it was not voluntary.  In support of his claim, he asserts that he was not advised of his right to remain silent and that "an element of deception . . . permeated the encounter" in that the agents secretly recorded the interview after they "lured" Defendant to the meeting under the guise of professional cooperation and by exploiting Defendant's professional responsibilities as a law enforcement officer.  [Doc. 33 at 11-15].  In response, the Government argues that the totality of the circumstances establish that the interview

19

was non-coercive and that Defendant's statement was voluntary.  [Doc. 34 at 11-15].
The Government has carried its burden to establish that Defendant's statement on
January 14, 2016, was voluntary.  See Lall, 607 F.3d at 1285 ("The burden is on the
prosecution to establish, by a preponderance of the evidence, that a challenged
confession was voluntary.").

The Supreme Court has recognized "that noncustodial interrogation might
possibly in some situations, by virtue of some special circumstances, be characterized
as one where 'the behavior of . . . law enforcement officials was such as to overbear
[a defendant's] will to resist and bring about confessions not freely self-determined .
. . .'" Beckwith v. United States, 96 S. Ct. 1612, 1617 (1976) (citation omitted).  It is
the court's duty "'to examine the entire record and make an independent determination
of the ultimate issue of voluntariness.'" Id. (quoting Davis v. North Carolina, 86 S. Ct.
1761, 1764 (1966)).  In determining whether a statement was made voluntarily, courts
are to evaluate "the totality of all the surrounding circumstances--both the
characteristics of the accused and the details of the interrogation." Schneckloth v.
Bustamonte, 93 S. Ct. 2041, 2047 (1973).  Those cases where courts have found
confessions to be involuntary "all have contained a substantial element of coercive
police conduct." Colorado v. Connelly, 107 S. Ct. 515, 520 & n.1 (1986) (citing

Mincey v. Arizona, 98 S. Ct. 2408 (1978) (defendant subjected to four hour interrogation while incapacitated and sedated in intensive-care unit); Greenwald v. Wisconsin, 88 S. Ct. 1152 (1968) (defendant, on medication, interrogated for over eighteen hours without food or sleep); Beecher v. Alabama, 88 S. Ct. 189 (1967) (police officers held gun to the head of wounded confessant to extract confession)). "[F]actors taken into account have included the youth of the accused, . . . his lack of education, . . . or his low intelligence, . . . the lack of any advice to the accused of his constitutional rights, . . . the length of detention, . . . the repeated and prolonged nature of the questioning, . . . and the use of physical punishment such as the deprivation of food or sleep . . . ." Schneckloth, 93 S. Ct. at 2047 (citations omitted). "'Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.'" United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (citation omitted). None of the factors identified by courts finding that a confession is involuntary are present in the instant case.

Defendant instead contends that his statement is involuntary because he was not advised of his right to remain silent - a non-starter as an argument because, since the interview was non-custodial, the agents were not required to advise Defendant of his

<u>Miranda</u> rights - and because of the agents' use of deception and trickery to lure him to the interview, without being honest with him about the nature of the interview. Again, Defendant's argument is largely undermined by the fact that the record does not support his claim of professionally having been compelled to meet with the agents or of somehow being required, due to the fear of losing his job, to answer any and all questions that they posed to him.

First, the agents were not required to provide Defendant with details about the nature of their investigative inquiry or that he was the focus of that inquiry.  <u>See</u> <u>United States v. Barner</u>, 572 F.3d 1239, 1244 (11th Cir. 2009) ("the Supreme Court has 'never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights'") (citation omitted).[12]  And Defendant's assertion that he was tricked into appearing for the interview and "cooperating" also fails to establish coercion under the facts of this case.  "[T]he law in the Eleventh Circuit is clear, that the police's use of a trick alone will not render a confession involuntary, unless there are *other*

---

[12]In the context of a custodial interrogation, the Eleventh Circuit Court of Appeals further explained that a defendant "must simply be aware that he may remain silent and request a lawyer, and that his statements may be used against him." <u>Id.</u>; <u>and</u> <u>see</u> <u>Colorado v. Spring</u>, 107 S. Ct. 851, 857-59 (1987).

aggravating circumstances beyond the mere use of deceptive tactics[.]" <u>United States v. Graham</u>, 2014 WL 2922388, at *10 (N.D. Ga. June 27, 2014) (quoting <u>United States v. Castaneda-Castaneda</u>, 729 F.2d 1360, 1363 (11th Cir. 1984)) (internal quotation marks omitted; emphasis in original).  "Indeed, '[c]onfessions are not generally rendered inadmissible merely because they are obtained by fraud, deception, or trickery practiced upon the accused, provided the means employed are not calculated to procure an untrue statement and the confession is otherwise freely and voluntarily made.'"  <u>Id.</u> (quoting <u>Moore v. Hopper</u>, 389 F. Supp. 931, 934 (M.D. Ga. 1974)); <u>compare</u> <u>United States v. Farley</u>, 607 F.3d 1294, 1328 (11th Cir. 2010) ("Knowledge of what the agents really suspected him of doing would no doubt have been useful, possibly even decisive, to Farley in calculating the wisdom of answering their questions.  But their deception on that point was not 'constitutionally significant,' because the lack of that information did not prevent Farley from understanding the nature of his rights and the legal consequences of waiving them.").

Nothing about the circumstances of the interview on January 14, 2016, evidences any attempt by the agents to coerce Defendant to speak to them, and there are no aggravating facts suggesting that Defendant answered questions unwillingly. Even if the court finds that the evidence supports an inference that the agents contacted

Defendant with the hope that he would agree to meet with them as a professional courtesy, Defendant's statement is not rendered involuntary. (Tr. at 6, 13, 17, 23-24, 29-31,44-46). Defendant did meet with the agents. However, the interview occurred in a location selected by Defendant, and, once the thirty-three minute interview started, Defendant was not restrained, threatened physically or verbally or misled regarding his rights - and the evidence suggests that Defendant, an experienced law enforcement officer, would be well aware of his <u>Miranda</u> rights - or the nature of the interview. (Tr. at 6-11, 27, 29, 34-35, 39-41, 44; Gov't Exh. 1).

Agent Benjamin advised Defendant that the interview involved a criminal investigation, not an administrative inquiry, involving a stolen vehicle - that did not involve a case that Defendant worked as a police officer. (Tr. at 13-14, 23-24, 28; Gov't Exh. 1). In fact, Agent Benjamin's questions rather quickly indicated that Defendant's involvement with the Pierces and the charges against them did not fall within the scope of Defendant's law enforcement duties and that the agents had suspicions about Defendant's role in the matter. The agent stated that he did not believe Defendant's answers about his involvement. However, even after that comment and being advised that he was suspected of soliciting a bribe, that is, being fully informed about the nature of the interview, Defendant did not terminate the

24

interview or ask for a lawyer.  (Tr. at 13-15, 24-25, 42-43; Gov't Exh. 1).  At any time, Defendant could have simply declined to answer any further questions instead of continuing to offer explanations for his conduct.  (Tr. at 29; Gov't Exh. 1).  "By contrast [to the facts before this court], statements have been held involuntary where the deception took the form of a coercive threat . . . or where the deception goes directly to the nature of the suspect's rights and the consequences of waiving them[.]" Farley, 607 F.3d at 1328-29 (citations omitted).  Accordingly, the court finds that even if Defendant was misled about the nature of the interview, there were no "'other aggravating circumstances' beyond the mere use of deceptive tactics" that "render[s Defendant's] confession involuntary[.]"  United States v. Hunter, 2015 WL 509995, at *12 (N.D. Ga. February 6, 2015) (citation omitted).

Finally, the agents' intent in secretly recording the interview (Tr. at 10-12, 26-27, 30-31) and in failing to initially inform Defendant that he was the subject of the criminal investigation (Tr. at 13-15, 23-24, 28-30, 42-44) are not relevant to the court's inquiry.  Farley, 607 F.3d at 1330 ("It does not matter if the agents deliberately lied to Farley about the subject of the investigation in order to trick him into signing a waiver they thought he might not otherwise have signed.  Their subjective motives for the deception are not relevant.").  "[T]he only relevant state of mind is that of [Defendant

25

Kidd] himself[,]" Id., and, based on the record before the court, which is silent as to what Defendant believed, the court would be speculating at best to posit what Defendant might have done had he been initially informed about the recording and the true nature of the interview.

For these reasons, the court finds that the totality of the circumstances surrounding the interview with Defendant supports a finding that his statement was voluntary.

## III.   Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 15] and perfected motion [Doc. 26] to suppress his January 14, 2016, statement be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

AO 72A
(Rev.8/82)

**SO ORDERED AND RECOMMENDED**, this 7th day of December, 2016.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)